NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12603


BEN BRANCH & others[1]  vs.  COMMONWEALTH EMPLOYMENT RELATIONS
BOARD & others.[2]



Suffolk.     January 8, 2019. - April 9, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.



Constitutional Law, Union, Freedom of association.  Voluntary
    Association, Labor union.  Labor, Union agency fee, Fair
    representation by union, Public employment.  Moot Question.
    Commonwealth Employment Relations Board.




Appeal from a decision of the Commonwealth Employment
Relations Board.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Bruce N. Cameron (Aaron B. Solem, of Minnesota, also
present) for the employees.
Timothy J. Casey, Assistant Attorney General (T. Jane
Gabriel also present) for Commonwealth Employment Relations
Board.

---

[1] William Curtis Conner, Jr.; Deborah Curran; and Andre
Melcuk.

[2] Massachusetts Society of Professors, MTA/NEA; Hanover
Teachers Association, MTA/NEA; and Professional Staff Union,
MTA/NEA, interveners.

Jeffrey W. Burritt, of the District of Columbia, for the interveners.

Mark G. Matuschak & Robert K. Smith, for Pioneer Institute, Inc., were present but did not argue.

The following submitted briefs for amici curiae:

Deborah J. La Fetra, of California, & Brad P. Bennion for Pacific Legal Foundation & others.

James A.W. Shaw & Donald J. Siegel for Massachusetts AFL-CIO.

Charlotte Garden, of the District of Columbia, & Brendan Sharkey for twenty-six labor law professors.


KAFKER, J.  Massachusetts, like most States, allows public sector employees in a designated bargaining unit to elect a union by majority vote to serve as their exclusive representative in collective bargaining with their government employer.  No eligible employee is required to join a union, but unions have historically collected mandatory "agency fees" from nonmembers in the bargaining unit to fund their operations as the exclusive representatives of members and nonmembers alike. In the instant case, four public employees raise challenges under the First Amendment to the United States Constitution to both the exclusive representation and the mandatory agency fee provisions of G. L. c. 150E.

The employees initially filed charges of prohibited practice before the Department of Labor Relations (DLR).  A DLR investigator dismissed the case, and the Commonwealth Employment Relations Board (board), the three-member board within the DLR responsible for reviewing investigator decisions, upheld the

dismissal.  The employees appealed to the Appeals Court, and while the case was on appeal, the United States Supreme Court, in Janus v. American Fed'n of State, County, & Mun. Employees, Council 31, 138 S. Ct. 2448, 2486 & n.28 (2018), held that all State "agency-fee laws . . . violate the [First Amendment]" by compelling nonmembers of public sector unions to support their unions' speech.  The employees argue that Janus requires us to overturn the board's decision dismissing their charges and declare the agency fee provision of the collective bargaining statute, G. L. c. 150E, § 12, unconstitutional on its face, and the exclusive representation provisions of the statute, G. L. c. 150E, §§ 2, 4, 5, 12, unconstitutional as applied to the employees.

We hold that the employees' constitutional challenge to the agency fee provision is moot because the unions voluntarily stopped collecting agency fees to comply with Janus.  It is not reasonably likely that they will recommence collecting the fees, as the Attorney General and the DLR have issued guidance explaining that Janus categorically prohibits public sector unions from collecting agency fees from members of a bargaining unit who do not belong to the union and do not consent to pay the fees, and the question of law is now settled.  We further hold that the employees' First Amendment challenge to the exclusive representation provisions of G. L. c. 150E is

foreclosed by Supreme Court precedent and thus lacks merit. We accordingly vacate as moot the board's decision with respect to the constitutionality of the agency fee provisions of G. L. c. 150E and affirm the board's decision with respect to the exclusive representation provisions of G. L. c. 150E.[3]

1. Facts and procedural history. The significant facts in this case are not disputed. As mentioned, the employees are public sector employees working in designated bargaining units. At all relevant times, however, they were not members of the unions that served as their exclusive bargaining representatives.[4] The collective bargaining agreements between the employers and the unions nonetheless contained provisions

---

[3] We acknowledge the amicus briefs submitted in support of the employees by the Pacific Legal Foundation, National Federation of Independent Business Small Business Legal Center, and Mackinac Center for Public Policy; and by the Pioneer Institute, Inc.; and the amicus briefs submitted in support of the Commonwealth Employment Relations Board and the interveners by twenty-six labor law professors and by the Massachusetts AFL-CIO.

[4] Two of the employees are faculty members represented by the Massachusetts Society of Professors (MSP), one is a university employee represented by the Professional Staff Union (PSU), and one is a middle school teacher represented by the Hanover Teachers Association (HTA). These three unions are affiliates of the Massachusetts Teachers Association (MTA). The MTA in turn is an affiliate of the National Education Association. The agency fee requests at issue in this case were imposed by the various unions, with the exception of the HTA.

authorizing the unions to collect agency fees from nonmembers.[5] The unions also maintained rules that nonmembers were "not entitled . . . to participate in affiliate decision-making," specifically to attend union meetings (other than contract ratification meetings) or "vote on election of officers, bylaw modifications, contract proposals or bargaining strategy."

In the spring of 2014, the unions requested that the employees pay their annual agency fees for the 2013-2014 academic year. In response, the employees filed complaints with the DLR alleging that these fee requests constituted a prohibited practice on the part of the unions and the employers.[6]

---

[5] General Laws c. 150E, § 12, provides, in relevant part, that nonunion members may be required to pay "a service fee [(i.e., agency fee)] to the employee organization" when the "collective bargaining agreement requiring its payment as a condition of employment has been formally executed, pursuant to a vote of a majority of all employees in such bargaining unit present and voting." Section 12 further provides that the amount of the service fee shall be equal to membership dues, provided that the employee organization has a procedure to provide a rebate for political, ideological, or other expenses "not germane to the [organization's] governance or duties as bargaining agent." Finally, § 12 provides that "[i]t shall be a prohibited labor practice for an employee organization or its affiliates to discriminate against an employee on the basis of the employee's membership, nonmembership or agency fee status in the employee organization or its affiliates."

[6] One of the employees had earlier filed a charge challenging the calculation of the amount of his agency fee. The employee subsequently filed an amended charge that rescinded his earlier allegation and raised a challenge to the validity of the agency fee that was identical to that raised by the other three employees.

The employees alleged that the requirement that they pay agency fees constituted a prohibited practice under G. L. c. 150E, §§ 10 (a) (1), (3), (b) (1), and 12, because "compulsory union fees . . . are unconstitutional under the First and Fourteenth Amendments [to the United States Constitution]."[7]  More specifically, the employees claimed that G. L. c. 150E, § 12, the statutory provision that authorizes public sector unions to collect agency fees, was unconstitutional on its face.[8]  They also claimed that this statute was unconstitutional as applied to them because it required them to pay agency fees "even though they are not entitled to attend union meetings or be involved in any union activities such as having a voice or a vote on bargaining representatives, contract proposals or bargaining

---

[7] Under G. L. c. 150E, § 10 (a) (1) and (3), it is a prohibited practice for a public employer to "[i]nterfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter" or to "[d]iscriminate in regard to hiring, tenure, or any term or condition of employment to encourage or discourage membership in any employee organization."  Under G. L. c. 150E, § 10 (b) (1), it is a prohibited practice for a union to "[i]nterfere, restrain, or coerce any employer or employee in the exercise of any right guaranteed under this chapter."

[8] The employees claimed that the agency fee provision was facially unconstitutional because it required them to (1) support the unions' political beliefs despite their opposition to those beliefs; and (2) affirmatively object to challenge the amount of the fee.  They also claimed that the requirement that they affirmatively object to the imposition of an agency fee was unconstitutional as applied.

strategy." Finally, they challenged the constitutionality of the exclusive representation provisions of G. L. c. 150E, § 5, for essentially the same reasons.[9]

A DLR investigator took affidavits from the employees and the unions, and then issued a decision in November 2014 dismissing the charges.[10] In her decision, the investigator concluded that the DLR did not have authority to address the employees' constitutional arguments. Instead, she only considered whether the employers and the unions had violated G. L. c. 150E. She concluded that G. L. c. 150E, § 5, expressly authorized the unions to serve as the employees' exclusive representatives and that they were permitted to enforce membership rules restricting service on negotiating committees

---

[9] General Laws c. 150E, § 5, provides that the "exclusive representative shall have the right to act for and negotiate agreements covering all employees in the unit and shall be responsible for representing the interests of all such employees without discrimination and without regard to employee organization membership."

[10] The employees submitted affidavits on their own behalf, as well as from four experts. The unions moved to strike these affidavits and, when this motion was denied, submitted counteraffidavits. The investigator admitted the employees' affidavits and those of two of the experts. She excluded some portions of the unions' affidavits and the employees' other two expert affidavits on the grounds that they were not relevant to agency fee procedures in Massachusetts. We decline to disturb the investigator's evidentiary ruling with respect to the employees' expert affidavits. See Maddocks v. Contributory Retirement Appeal Bd., 369 Mass. 488, 498 (1976) (court will not overturn agency's discretionary exclusion of evidence absent "denial of substantial justice").

to union members.  She further concluded that, under controlling precedent of this court and the United States Supreme Court, neither the employers nor the unions engaged in a prohibited practice by requiring nonmember employees to pay agency fees to a public sector union pursuant to G. L. c. 150E, § 12.

The employees sought review of the investigator's dismissal of their charges by the board pursuant to G. L. c. 150E, § 11. They conceded in their briefing that "existing precedent" required the board to uphold the dismissal of the unfair labor practice charges but appealed in order "to exhaust administrative remedies" and preserve their constitutional arguments for appellate review.  In February 2015, the board affirmed the dismissal in its entirety for the reasons set forth in the investigator's decision.  The employees then appealed from the board's decision to the Appeals Court.  That court granted the unions' motion to intervene and stayed the case until the Supreme Court issued Janus in June 2018.  We then transferred the case to this court on our own motion and ordered supplemental briefing.

2. Mootness. We first address the employees' argument that Janus requires us to overturn the board's decision upholding the unions' collection of agency fees pursuant to the agency fee provision, G. L. c. 150E, § 12.  The Supreme Court, in Janus, 138 S. Ct. at 2486, held that "States and public

sector unions may no longer extract agency fees from nonconsenting employees," and the board and the unions accordingly concede that "public employers and public-sector unions can no longer collect agency fees from nonunion employees unless they affirmatively consent." The board argues that both the employers and unions have voluntarily complied with Janus by no longer permitting the nonconsensual collection of agency fees from employees who are not in a union, and hence that the portion of its decision dismissing the employees' constitutional challenges to the imposition of agency fees and the manner of their collection should be vacated and dismissed as moot.[11] We

---

[11] The intervener unions argue that we lack jurisdiction to decide the employees' constitutional challenges because the employees brought them before an administrative agency rather than through seeking a declaratory judgment in the Superior Court. We disagree. The instant case did not just raise a direct challenge to the constitutionality of the agency fee provision of G. L. c. 150E, § 12. Instead, it required the Department of Labor Relations (DLR) to apply multiple statutory requirements consistent with its understanding of constitutional law and to draw on its own expert knowledge of labor relations practices and procedures in deciding the questions before it.

As explained by the DLR investigator, while the charges presented facial challenges to the constitutionality of the agency fee and exclusive representation provisions in G. L. c. 150E, they also "raised allegations . . . that the service fees demanded violate specific provisions of [G. L. c. 150E], i.e. that prohibiting non-members from joining a union negotiating team, while simultaneously requiring service fees, violates [G. L. c. 150E, § 10 (b) (1),] by coercing employees in the exercise of their rights to non-membership; and that the employers' agreement to a contractual service fee provision violated [§ 10 (a) (3)]." In deciding these issues the DLR was required to "apply [§ 12] . . . constitutionally, using

decisions of the United States Supreme Court to guide its construction of [G. L. c. 150E]," and to resolve "factual issues that are appropriate for the agency's consideration, i.e. the extent to which the unions allow or prohibit fee payers from participating in the negotiations process."

We conclude that the DLR correctly assumed jurisdiction here for the reasons it stated. In the course of their adjudications, agencies must "decide questions of law, including, at times, questions of constitutional law." Temple Emanuel of Newton v. Massachusetts Comm'n Against Discrimination, 463 Mass. 472, 483 (2012). "Although an agency cannot decide an ultimate constitutional issue [regarding the legality of its statute], the question remains whether such an issue must nonetheless be brought before it to inform the agency's resolution of the statutory and regulatory questions it must consider and to draw on its specialized expertise for necessary fact finding." Maher v. Justices of the Quincy Div. of the Dist. Court Dep't, 67 Mass. App. Ct. 612, 619 (2006). With the benefit of an agency's factual determinations, understanding of its regulated industry, and statutory construction, a court can then decide whether the agency's determinations were made in compliance with or "[i]n violation of constitutional provisions." G. L. c. 30A, § 14. See, e.g., Selectmen of Framingham v. Civil Serv. Comm'n, 366 Mass. 547, 554 (1974) (emphasizing that Civil Service Commission "will need to take up and consider the factual matters underlying the issue of the constitutional validity of the regulation since these matters are here intrinsic to a decision as to 'just cause'" even though "the ultimately controlling decision of a constitutional issue is for the courts"). Although not directly argued below, the instant case also depends on an interpretation of the duty of fair representation, which involves the special expertise of the DLR. "As a matter of promoting proper relationships between the courts and administrative agencies, strong policies support the primary jurisdiction of the [DLR] over cases involving the duty of fair representation." Leahy v. Local 1526, Am. Fed'n of State, County, & Mun. Employees, 399 Mass. 341, 349 (1987).

A different question would be presented if this case were only presenting a challenge to the constitutionality of enabling legislation. Cf. Doe, Sex Offender Registry Bd. No. 10800 v. Sex Offender Registry Bd., 459 Mass. 603, 630-631 (2011) (court without jurisdiction to hear constitutional challenge to agency's enabling statute and implementing regulations when

agree with the board, and thus vacate that portion of the board's decision as moot.

It is a "general rule that courts decide only actual controversies . . . and normally do not decide moot cases." Boston Herald, Inc. v. Superior Court Dep't of the Trial Court, 421 Mass. 502, 504 (1995). "[L]itigation is considered moot when the party who claimed to be aggrieved ceases to have a personal stake in its outcome." Bronstein v. Board of Registration in Optometry, 403 Mass. 621, 627 (1988).[12] A moot

_____

first brought on appeal from agency decision rather than in declaratory judgment action in court). If after Janus v. American Fed'n of State, County, & Mun. Employees, Council 31, 138 S. Ct. 2448, 2486 (2018), had been decided, the employees had simply brought a declaratory judgment action seeking a declaration that G. L. c. 150E, § 12, was unconstitutional, such an action should have been brought in the Superior Court. The multifaceted challenge here is different and requires administrative review in the first instance. See Gurry v. Board of Pub. Accountancy, 394 Mass. 118, 126 (1985) ("Except for jurisdictional claims based upon constitutional challenges to an agency's enabling legislation, litigants involved in adjudicatory proceedings should raise all claims before the agency, including those which are constitutionally based"). See, e.g., Seagram Distillers Co. v. Alcoholic Beverages Control Comm'n, 401 Mass. 713, 724 (1988) (facial and as applied constitutional challenges to statute "not raised before the commission and we therefore decline to consider them here for the first time"). See also, e.g., McCormick v. Labor Relations Comm'n, 412 Mass. 164, 169-170 (1992) (relying on Seagram Distillers Co., supra, to conclude that party raising First Amendment challenge to validity of agency fee waived that challenge by not raising it before Labor Relations Commission).

We thus conclude that the DLR correctly determined that it had jurisdiction.

[12] "The mootness doctrine applies to judicial review of administrative decisions as well as to appellate review of lower

case is one where a court can order "no further effective relief." Lawyers' Comm. for Civ. Rights & Economic Justice v. Court Adm'r of the Trial Court, 478 Mass. 1010, 1011 (2017).

Here, the unions presented affidavits[13] demonstrating that they did not collect any agency fees from the employees while their complaints were pending, stopped collecting agency fees entirely in anticipation of Janus, and no longer collected agency fees from nonmembers once Janus was issued in order to comply with the decision.[14]  Furthermore, both the Attorney

---

court decisions."  International Marathons, Inc. v. Attorney Gen., 392 Mass. 376, 380 (1984).

[13] To determine whether a case has become moot while it is on appeal, we may consider evidence introduced by the parties in the form of affidavits.  Doe v. Superintendent of Sch. of Worcester, 421 Mass. 117, 123 (1995), citing Hubrite Informal Frocks, Inc. v. Kramer, 297 Mass. 530, 532-533 (1937) ("Affidavits are the proper way to raise a question of mootness").

[14] To comply with the prohibition on the collection of agency fees announced in Janus, 138 S. Ct. at 2486, the general counsel of the MTA sent letters to its local affiliates on April 25 and May 2, 2018, instructing them to stop collecting agency fees preemptively as of June 1, 2018, in the event that "the collection of agency fees is declared unconstitutional." Following the issuance of Janus on June 27, 2018, the MTA informed its affiliates that they may "no longer deduct agency fees from a nonmember's wages" and processed a "bulk cancellation" of agency fees.  Furthermore, the presidents of the affiliate unions involved in this case (i.e., the MSP, PSU, and HTA) stated that, on account of Janus, they no longer collect agency fees.  Additionally, in November 2018, the MTA executive committee approved the removal of any reference to "agency service fees" from its bylaws.

General and the DLR issued guidance explaining that Janus prohibits public employers and public sector unions from collecting agency fees from members of a bargaining unit who do not belong to the union and do not consent to pay the fees.[15] And, as mentioned, the unions and employers concede that they are bound by Janus.  In light of these significant steps by the unions and the unequivocal legal guidance issued by the relevant agencies, we are not persuaded by the employees' claim that there is "no reason to expect any change" in the challenged conduct involving agency fees.[16]  Nor is this the exceptional

---

[15] See Department of Labor Relations, Question and Answer Regarding Impacts of Janus v. American Federation of State, County, and Municipal Employees, Council 31, https://www.mass .gov/service-details/dlr-qa-re-janus-v-american-fed-of-state- cty-muni-employees [https://perma.cc/XG43-Z9DW] ("The Janus decision makes it unlawful for public sector employers or unions to require that an employee who is not a voluntary dues paying union member to pay an agency fee to a union as a condition of obtaining employment or continued employment" and any "agency shop arrangements contained in collective bargaining agreements are invalidated"); Office of the Attorney General, Attorney General Advisory:  Affirming Labor Rights and Obligations in Public Workplaces, https://www.mass.gov/files/documents/2018 /07/03/Attorney%20General%20Advisory%20-%20Rights%20of%20Public %20Sector%20Employees%20%287-3%29.pdf [https://perma.cc/74LP- EVMF] ("Under Janus, public employers may not deduct agency fees from a nonmember's wages, nor may a union collect agency fees from a nonmember, without the employee's affirmative consent").

[16] A defendant whose voluntary conduct renders a case moot must satisfy a "heavy burden of showing that there is no reasonable expectation that the wrong will be repeated; and a defendant's mere assurances on this point may well not be sufficient."  Cantell v. Commissioner of Correction, 475 Mass. 745, 753 n.16 (2016), quoting Wolf v. Commissioner of Pub. Welfare, 367 Mass. 293, 299 (1975).  This burden may be met by a

case where we exercise our discretion to decide a moot case.[17]

Because no agency fee demands are currently being made on the

employees, and because any such demands are not likely to recur,

there is no "actual controvers[y]" for the court to decide and

no "effective relief" for it to order.  Murphy v. National Union

Fire Ins. Co., 438 Mass. 529, 533 (2003).  See Lawyers' Comm.

---

policy change by an administrative agency or by other change in
conduct to comply with the law.  See Bronstein v. Board of
Registration in Optometry, 403 Mass. 621, 626-627 (1988) (case
moot where administrative board agreed not to enforce order that
was no longer in compliance with amended statute); Buchannan v.
Superintendent of Mass. Correctional Inst. at Concord, 9 Mass.
App. Ct. 545, 548-550 (1980) (case moot where bulletin issued by
Department of Correction addressed challenged correctional
practice and issuance of bulletin suggested defendants did not
"cease[] their allegedly wrongful conduct in order to escape
review").  See also Danielson v. Inslee, 345 F. Supp. 3d 1336,
1339 (W.D. Wash. 2018) (post-Janus challenge to mandatory agency
fee law moot because it was "improbable that the State will
renege on a policy it has justified by legal precedent").

    [17] We have discretion to decide a moot case where the issue
is one of "significant public importance, and there appears to
be some uncertainty about it," or "where the parties have fully
briefed and argued the issues of a case, and . . . the issues
are capable of repetition, yet evading review" (quotation and
citations omitted).  Commonwealth v. McCulloch, 450 Mass. 483,
486 (2008).  Here, there is no uncertainty that Janus forbids
the collection of agency fees from nonconsenting bargaining unit
members who are not in a union.  See Ladley vs. Pennsylvania
State Educ. Ass'n, No. CI-14-08552, slip op. at 23 (Pa. Ct. Com.
Pl. Oct. 29, 2018) (declining to decide moot post-Janus agency
fee challenge on public interest grounds because no need for
court to create "guideposts for future conduct or action"
[citation omitted]).  Nor is the issue one that is likely to
evade review should it arise again:  the challenged issue "is
one of law" that would likely receive immediate judicial review
and rebuke if a union sought to impose an agency fee despite
Janus.  Ott v. Boston Edison Co., 413 Mass. 680, 684 (1992).

for Civ. Rights & Economic Justice, 478 Mass. at 1011.  We therefore hold that the unions' cessation of agency fee collection to comply with Janus and the issuance by the Attorney General and the DLR of guidance categorically prohibiting their collection has rendered moot the employees' challenge to the agency fee provisions of G. L. c. 150E.[18]

3.  Constitutionality of exclusive representation.  The employees also challenge the constitutionality of their unions' exclusive representation of their employees in collective bargaining, claiming that exclusive representation compels them to associate with the unions in violation of the First Amendment.[19]  We conclude that, under controlling Supreme Court

---

[18] This conclusion accords with those of other courts that have dismissed challenges to the constitutionality of State agency fee laws on mootness grounds following the issuance of Janus and the corresponding cessation in the collection of agency fees by public sector unions.  See Danielson, 345 F. Supp. 3d at 1339-1340; Danielson v. American Fed'n of State, County, & Mun. Employees, Council 28, AFL-CIO, 340 F. Supp. 3d 1083, 1084 (W.D. Wash. 2018); Lamberty vs. Connecticut State Police Union, U.S. Dist. Ct., No. 3:15-cv-378 (D. Conn. Oct. 19, 2018); Yohn vs. California Teachers' Ass'n, U.S. Dist. Ct., No. SACV 17-202-JLS-DEM (C.D. Cal. Sept. 28, 2018); Ladley, supra.

[19] The unions argue that the employees' exclusive representation challenge is not properly before this court because the employees failed to raise it below.  Specifically, they point out that the employees' charges were addressed to G. L. c. 150E, § 12, the agency fee provision, and not to the exclusive representation provisions of G. L. c. 150E.  Yet the investigator's decision addressed the employees' "challenge [to] the concept of exclusive representation as a burden on their [First] Amendment right of association."  The employees then appealed to the board from the investigator's conclusion that

precedent, neither the exclusive representation provisions of G. L. c. 150E nor the unions' internal policies and procedures barring nonmembers from various collective bargaining activities violate the First Amendment.

General Laws c. 150E, § 4, provides that "[p]ublic employers may recognize an employee organization designated by the majority of the employees in an appropriate bargaining unit as the exclusive representative of all the employees in such unit for the purpose of collective bargaining."  In turn, G. L. c. 150E, § 5, provides that the "exclusive representative shall have the right to act for and negotiate agreements covering all employees in the unit and shall be responsible for representing the interests of all such employees without discrimination and without regard to employee organization membership."  We have explained that the "exclusive representation concept" is "a basic building block of labor law policy under G. L. c. 150E." Service Employees Int'l Union, AFL-CIO, Local 509 v. Labor Relations Comm'n, 431 Mass. 710, 714-715 (2000).  The same is true under Federal labor relations law.[20]

_____

"[e]xclusive representation, pursuant to G. L. c. 150E §§ 4 [and] 5, is constitutional."  We thus conclude that the issue was sufficiently raised below.

[20] The National Labor Relations Act (NLRA) provides that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive

Our analysis of exclusive representation is guided by an uninterrupted line of decisions in which the Supreme Court has affirmed its "long and consistent adherence to the principle of exclusive representation tempered by safeguards for the protection of minority interests" provided by the duty of fair representation.  Emporium Capwell Co. v. Western Addition Community Org., 420 U.S. 50, 65 (1975).  Exclusive representation, as the Supreme Court has explained, is necessary to effectively and efficiently negotiate collective bargaining agreements and thus promote peaceful and productive labor-management relations.  See, e.g., National Labor Relations Bd. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 180 (1967) ("National

representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a).  For cases discussing exclusive representation under the NLRA, see, e.g., 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 270-271 (2009), quoting Emporium Capwell Co. v. Western Addition Community Org., 420 U.S. 50, 62 (1975) ("In establishing a regime of majority rule, Congress sought to secure to all members of the [bargaining] unit the benefits of their collective strength and bargaining power, in full awareness that the superior strength of some individuals or groups might be subordinated to the interest of the majority"); Vaca v. Sipes, 386 U.S. 171, 191 (1967) (discussing importance of exclusive representation in grievance arbitration context); Steele v. Louisville & Nashville R.R., 323 U.S. 192, 200-201 (1944) (describing exclusive representation under NLRA); J.I. Case Co. v. National Labor Relations Bd., 321 U.S. 332, 338-339 (1944) (under NLRA, employer must bargain with exclusive representative, rather than individually with employees, because "the majority rules" and to allow individual negotiations would "prove . . . disruptive of industrial peace).

labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions.  The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees").  See also Carlson, The Origin and Future of Exclusive Representation in American Labor Law, 30 Duq. L. Rev. 779, 780 (1992) ("Majority-rule based exclusivity bolsters a union's bargaining position, legitimizes its complete control over employee bargaining within a unit and, even from the employer's perspective, simplifies the bargaining process. Collective bargaining on any other basis faces considerable practical difficulties" [footnote omitted]).[21]

---

[21] For discussions of the policy rationales for exclusive representation, see, e.g., Janus, 138 S. Ct. at 2465 (discussing how exclusive representation serves "compelling state interest" in "labor peace" [citation omitted]); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 38-39, 52 (1983) (rejecting First Amendment challenge to term in collective bargaining agreement restricting use of interschool mail system to exclusive representative because "exclusion of the rival union may reasonably be considered a means of insuring labor-peace within the schools"); Vaca, 386 U.S. at 191 (explaining that if individual employees could bypass collective bargaining agreement with respect to grievance arbitration "the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the

In particular, our analysis of the constitutionality of exclusive representation is informed by Knight v. Minnesota Community College Faculty Ass'n, 460 U.S. 1048 (1983) (Knight I); Minnesota State Board for Community Colleges v. Knight, 465 U.S. 271 (1984) (Knight II); and Janus itself.  In the two Knight decisions and Janus, the majority and the dissents alike recognized and respected the importance of exclusive representation in the collective bargaining process, at least in the negotiation of the terms and conditions of employment.

In Knight I, 460 U.S. at 1048, a case involving faculty at State community colleges, the Supreme Court summarily affirmed the portion of the lower court's decision concluding that it was constitutional to limit collective bargaining sessions (known as "meet and negotiate" sessions) regarding the terms and conditions of employment to the faculty's exclusive representative.  See Knight II, 465 U.S. at 279 ("The Court's

---

union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation"); Medo Photo Supply Corp. v. National Labor Relations Bd., 321 U.S. 678, 685 (1944) ("orderly collective bargaining requires that the employer be not permitted to go behind the designated representatives, in order to bargain with the employees themselves").  See also Matter of Houde Engineering Corp. & United Auto. Workers Fed. Labor Union No. 18839, 1 N.L.R.B. 35, 40 (1934) (exclusive representation provision of Federal law designed to stop employers from exploiting "differences within the ranks" of employees); Carlson, The Origin and Future of Exclusive Representation in American Labor Law, 30 Duq. L. Rev. 779, 814 (1992) ("Without exclusivity, employee factions would inevitably make conflicting proposals and demands").

summary affirmance . . . rejected the constitutional attack on [the State statute's] restriction to the exclusive representative of participation in the 'meet and negotiate' process"). In summarily affirming the lower court, it thus appeared noncontroversial to the Court to limit collective bargaining regarding the terms and conditions of employment to the exclusive representative and to recognize the "constitutionality of exclusive representation bargaining in the public sector." Knight v. Minnesota Community College Faculty Ass'n, 571 F. Supp. 1, 4 (D. Minn. 1982), aff'd in part, 460 U.S. 1048 (1983). This decision is in line with earlier Supreme Court decisions that recognize and respect the need for an exclusive bargaining representative. See Emporium Capwell Co., 420 U.S. at 65. See also notes 20 and 21, supra (citing cases).

In Knight II, 465 U.S. at 292, the Court extended the right of exclusive representation to "meet and confer" sessions with the employer regarding university governance and academic matters outside the scope of the mandatory bargaining that took place in the "meet and negotiate" sessions deemed constitutional in Knight I. Although Knight II, supra at 288, presented a more difficult question than exclusive representation in the collective bargaining context, and one that divided the Court, the majority held that the nonmembers' "speech and associational rights . . . [had] not been infringed" even by this type of

government-imposed exclusive representation.  Specifically, the Court observed that exclusive representation was constitutional because the First Amendment creates no "government obligation to listen" to particular voices on policy questions, and the State's right to designate the faculty union as the exclusive representative for the "meet and confer" sessions (as well as the "meet and negotiate" sessions) was within its inherent right to "choose its advisers."  Id. at 288 & n. 10.

The Court further explained that such exclusive representation did not impair the nonmember employees' associational freedoms, as the nonmembers were "not required to become members of the [union]."  Id. at 289.  Although the nonmembers "[might] well [have felt] some pressure to join the exclusive representative" to gain a "voice" in the "meet and confer" sessions, such pressure was "no different from the pressure to join a majority party that persons in the minority always feel."  Id. at 289-290.  This sort of pressure, the Court explained, is inherent both in majority rule, which is a guiding principle of "our system of government," and in the collective bargaining process; as such, "it does not create an unconstitutional inhibition on associational freedom."  Id. at 290.

Janus, a challenge to the agency fee provision of a State collective bargaining law, did not in any way question the

centrality of exclusive representation, at least in the collective bargaining process.  There, the Court "noted" that exclusive representation provided the union with the "exclusive right to speak for all the employees in collective bargaining" and that the employer was "required by state law to listen to and bargain in good faith with only that union."  Janus, 138 S. Ct. at 2467.  Indeed, the Court expressly observed that it is "not disputed that the State may require that a union serve as exclusive bargaining agent for its employees," and that, with the exception of laws permitting mandatory agency fees, "States can keep their labor-relations systems exactly as they are." Id. at 2478, 2485 n.27.  See id. at 2489 (Kagan, J., dissenting) ("The majority does not take issue with the [concept of exclusive representation]").  And the Court assumed that "labor peace," defined as the avoidance of "the conflict and disruption" that would occur if employees were "represented by more than one union," was a "compelling state interest," but that mandatory agency fees were not "inextricably linked" to such peace (citation omitted).  Id. at 2465.  It was this "compelling state interest" that apparently justified the "significant impingement on associational freedoms that would not be tolerated in other contexts."  Id. at 2478.[22]

---

[22] This conclusion accords with those of other courts that have rejected First Amendment challenges to the

constitutionality of exclusive representation provisions of State public sector collective bargaining laws, including a previous challenge to G. L. c. 150E.  See D'Agostino v. Baker, 812 F.3d 240, 243 (1st Cir.), cert. denied, 136 S. Ct. 2473 (2016) (Justice Souter, writing for court and rejecting First Amendment challenge to G. L. c. 150E on basis of Minnesota State Board for Community Colleges v. Knight, 465 U.S. 271 [1984] [Knight II], reasoned, "Since non-union professionals, college teachers, could claim no violation of associational rights by an exclusive bargaining agent speaking for their entire bargaining unit when dealing with the state even outside collective bargaining, the same understanding of the First Amendment should govern the position taken by the [appellants] here, whose objection goes only to bargaining representation").  See also Mentele v. Inslee, 916 F.3d 783, 789 (9th Cir. 2019) (holding, on basis of Knight II, that State's "authorization of an exclusive bargaining representative does not infringe" on First Amendment rights of nonunion members); Bierman v. Dayton, 900 F.3d 570, 574 (8th Cir. 2018) (home care providers' argument that their First Amendment rights were violated by compelled association with their exclusive representative "foreclosed by [Knight II]"); Hill v. Service Employees Int'l Union, 850 F.3d 861, 864 (7th Cir.), cert. denied, 138 S. Ct. 446 (2017) (Knight II "forecloses . . . argument" of home health care and child care providers that exclusive representation creates "mandatory association" subject to heightened First Amendment scrutiny); Jarvis v. Cuomo, 660 Fed. Appx. 72, 74 (2d Cir. 2016), cert. denied, 137 S. Ct. 1204 (2017) (child care providers' argument that their First Amendment rights were violated by compelled association with their exclusive representative "foreclosed" by Knight II); Thompson vs. Marietta Education Ass'n, U.S. Dist. Ct., No. 2:18-cv-628 (S.D. Ohio Jan. 14, 2019) (Knight II "forecloses" high school Spanish teacher's First Amendment challenge to exclusive representation provision of State statute); Reisman vs. Associated Faculties of the Univ. of Me., U.S. Dist. Ct., No. 1:18-cv-00307-JDL (D. Me. Dec. 3, 2018) ("binding precedent" of Knight II "forecloses" faculty member's First Amendment challenge to exclusive representation provision of State collective bargaining law); Uradnik vs. Inter Faculty Org., U.S. Dist. Ct., No. 18-1895 (PAM/LIB) (D. Minn. Sept. 27, 2018), aff'd, U.S. Ct. App., No. 18-3086 (8th Cir. Dec. 3, 2018) (Knight II "foreclose[s]" faculty member's First Amendment challenge to exclusive representation provision of State collective bargaining law).

Janus and the other Supreme Court cases have thus not questioned the constitutionality of exclusive representation. The Court has, however, inextricably coupled exclusive representation with a union's duty of fair representation. See, e.g., Janus, 138 S. Ct. at 2469 (duty of fair representation "is a necessary concomitant of the authority that a union seeks when it chooses to serve as the exclusive representative of all the employees in a unit"). As the exclusive representative of both members and nonmembers, the union has a duty "fairly to represent all [employees in the bargaining unit], both in its collective bargaining with [the employer] . . . and in its enforcement of the resulting collective bargaining agreement." Vaca v. Sipes, 386 U.S. 171, 177 (1967).[23]

The focus of this duty in the negotiating context has not been on input but on output, i.e., on the results of the collective bargaining process. Most significantly, the "union may not negotiate a collective-bargaining agreement that

---

[23] The Supreme Court has stated that "constitutional questions [would] arise" regarding the legitimacy of exclusive representation in the absence of the duty of fair representation. Steele, 323 U.S. at 198. In Massachusetts, that duty is codified by statute. See G. L. c. 150E, § 5 (exclusive representative required to "represent[] the interests of all . . . employees without discrimination and without regard to employee organization membership"). See also Leahy, 399 Mass. at 348 ("even if the Massachusetts statute did not provide for the duty of fair representation, the courts would infer it as a constitutional requirement").

discriminates against nonmembers." Janus, 138 S. Ct. at 2468.
Cf. Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953) ("mere
existence of . . . differences" in way that "negotiated
agreement affect[s] individual employees and classes of
employees" will not violate duty of fair representation so long
as differences are reasonable and negotiated in good faith).  By
contrast, the duty of fair representation has not been found to
apply to how the union selects its negotiators and develops its
proposals.  See National Labor Relations Bd. v. Financial Inst.
Employees of Am., Local 1182, Chartered by United Food &
Commercial Workers Int'l Union, AFL-CIO, 475 U.S. 192, 205
(1986) (Financial Inst. Employees), quoting Allis-Chalmers Mfg.
Co., 388 U.S. at 191 (explaining that union may "select union
officers and bargaining representatives" without input of
nonmembers because "[n]on-union employees have no voice in the
affairs of the union"); Standard Fittings Co. v. National Labor
Relations Bd., 845 F.2d 1311, 1319 (5th Cir. 1988), citing
Financial Inst. Employees, supra (duty of fair representation
does not give nonmembers right to "ratify a collective-
bargaining agreement or select union officers and bargaining
representatives"); Branch 6000, Nat'l Ass'n of Letter Carriers
v. National Labor Relations Bd., 595 F.2d 808, 811 (D.C. Cir.
1979) ("non-union employees properly may be excluded" from
processes of formulating union's negotiating position without

violating duty of fair representation).  See also <u>Southern Worcester County Reg'l Vocational Sch. Dist</u>. v. <u>Labor Relations Comm'n</u>, 377 Mass. 897, 904 (1979) ("selection of the union negotiating team [is] an internal union matter"); <u>George</u> v. <u>Local Union No. 639, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO</u>, 100 F.3d 1008, 1010-1011, 1014 (D.C. Cir. 1996) (union did not violate duty of fair representation by not permitting member from serving on negotiating committee or attending negotiating meetings); <u>Sears</u> v. <u>Automobile Carriers, Inc</u>., 711 F.2d 1059 (6th Cir. 1983) (unpublished) (union did not commit breach of duty of fair representation by removing member from negotiating committee); <u>Bass</u> v. <u>International Bhd. of Boilermakers</u>, 630 F.2d 1058, 1063 (5th Cir. 1980) ("internal union decisions" are "not circumscribed by the constraints of the [duty of fair representation]"); <u>Matter of Phalen</u> v. <u>Theatrical Protective Union No. 1, Int'l Alliance of Theatrical & Stage Employees, A.F.L.-C.I.O</u>., 22 N.Y.2d 34, 44, cert. denied, 393 U.S. 1000 (1968) ("an action for breach of the duty of fair representation by one who has been discriminated against, although it may afford him an important remedy, is no substitute for democratic participation in the affairs of the union.  Unless an individual is a member of the union, he can have no voice in the selection of its officers who are his representatives in the collective

bargaining process").  Cf. <u>Anderson</u> v. <u>Commonwealth Employment Relations Bd</u>., 73 Mass. App. Ct. 908, 909 n.5 (2009) (union rule that retired members could not vote on collective bargaining agreements did not "violate[] the duty of fair representation" because "the plaintiffs' voting claim" was "a purely internal matter").

We now address the employees' contention that they are not challenging exclusive representation "in the abstract," but only insofar as the unions use exclusive representation to deprive them of "a voice and a vote in their workplace conditions" with respect to bargaining representatives, contract proposals, and bargaining strategy unless they join the unions and support their politics.  We conclude that this argument is likewise without merit.

As an initial matter, we address the employees' claim that the unions are involved in "State action" for purposes of a First Amendment challenge to their internal rules restricting the participation of nonmembers in certain meetings or strategy sessions.  As then Circuit Judge Breyer, writing for the United States Court of Appeals for the First Circuit, explained, the "link between the union's [government-created] bargaining power and its membership requirements is too distant to impose constitutional restrictions."  <u>Hovan</u> v. <u>United Bhd. of Carpenters & Joiners of Am</u>., 704 F.2d 641, 645 (1st Cir. 1983).

He further concluded that, while exclusive representation is a creature of statute, internal union rules not dictated by statute do not constitute State action, and holding otherwise "would radically change not only the legal, but the practical, nature of the union enterprise." Id. at 642-643. Accord United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski, 457 U.S. 102, 104, 121 n.16 (1982) (union's adoption of "outsider rule" prohibiting nonmembers from contributing to union elections did not violate "nonmembers' constitutional rights of free speech and free association" because "the union's decision to adopt an outsider rule does not involve state action"); Kidwell v. Transportation Communications Int'l Union, 946 F.2d 283, 299 (4th Cir. 1991), cert. denied, 503 U.S. 1005 (1992) (for purposes of First Amendment challenge, "the internal membership and procedural decisions of a union . . . , although having an impact on those who may participate in the union's duties in carrying out its role as collective bargaining representative, do[] not constitute state action"); Turner v. Air Transport Lodge 1984 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, 590 F.2d 409, 413 n.1 (2d Cir. 1978), cert. denied, 442 U.S. 919 (1979) (per curiam) (Mulligan, J., concurring) ("since union constitutions and rules are formulated and enforced by the union, a private entity, no federal constitutional right of free speech is . . . involved"). While these cases involved private

sector unions, State action has been found lacking in the public sector union context as well. See, e.g., Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7, 570 F.3d 811, 817 (7th Cir.), cert. denied, 558 U.S. 1049 (2009) ("Here, it was the Union, rather than the employer, that barred the plaintiffs from membership. And union actions taken pursuant to the organization's own internal governing rules and regulations are not state actions"); Harmon v. Matarazzo, 162 F.3d 1147 (2d Cir.) (unpublished), cert. denied, 525 U.S. 1042 (1998) (police officer's Federal civil rights claim against police union "not actionable" because union "is not a state actor"); Messman v. Helmke, 133 F.3d 1042, 1044 (7th Cir. 1998) ("a union's internal governing rules usually are not subject to First Amendment prohibitions"); Jackson v. Temple Univ. of the Commonwealth Sys. of Higher Educ., 721 F.2d 931, 933 (3d Cir. 1983) (public employee's Federal civil rights claim against union not actionable where plaintiff failed "to set forth any facts suggesting that the state was responsible for the Union or that the Union was acting under color of state law in deciding not to bring [his] grievance to arbitration"). We conclude that here the link between exclusive representation and the unions' membership requirements are likewise too attenuated to constitute State action.

Moreover, even if we were to assume that the link between statutorily required exclusive representation and union membership requirements might be sufficient in certain circumstances to satisfy the State action requirement, we would still discern no constitutional problems. Employees in the bargaining unit received a vote on whether to form their unions; those opposed to having a union lost that vote. The "majority-rule concept is . . . unquestionably at the center of our federal labor policy," and hence the "complete satisfaction of all who are represented is hardly to be expected" (citations omitted). Allis-Chalmers Mfg. Co., 388 U.S. at 180. See Emporium Capwell Co., 420 U.S. at 62 ("majority rule" is "[c]entral to the policy of fostering collective bargaining"). Indeed, as the Court in Knight II, 465 U.S. at 290, observed, majority rule is a fundamental aspect of American democratic government. Those who lose elections often do not have representatives speaking in favor of their personal policy preferences, at least until the next election. Like these members of the electorate, the employees have another chance to vote:  they can vote to decertify the union after a certain period of time. See G. L. c. 150E, § 4. See also Watertown v. Watertown Mun. Employees Ass'n, 63 Mass. App. Ct. 285, 291-292 (2005) (describing "the employees' right to select new union

representation" as "a collective bargaining right that is beyond the arbitrator's powers" to penalize).

In the meantime, their inability to select bargaining representatives or participate in bargaining sessions is a consequence of losing the election regarding union representation and choosing not to join the union after having lost. This is an intended and expected feature of exclusive representation. See Emporium Capwell Co., 420 U.S. at 62 (in creating exclusive representation, Congress intended "regime of majority rule" in which interests of some employees "might be subordinated to the interest of the majority"). Hence, "exclusive bargaining representation by a democratically selected union does not, without more, violate the right of free association on the part of dissenting non-union members of the bargaining unit." D'Agostino v. Baker, 812 F.3d 240, 244 (1st Cir.), cert. denied, 136 S. Ct. 2473 (2016).

Moreover, as discussed, conflicting representatives in collective bargaining is not practicable: to have the employee representatives speak with one voice at the bargaining table is critical to the efficient resolution of labor-management disputes and protects the bargaining unit employees from divide-and-conquer tactics by employers. See note 21, supra (citing cases). Thus, as the Court in Knight II, 465 U.S. at 291, concluded, "The state has a legitimate interest in ensuring that

its public employers hear one, and only one, voice presenting the majority view of its professional employees on employment-related policy questions," and exclusive representation is a "rational means of serving that interest."

Finally, the nonunion employees, even if they do not have input into bargaining committees or bargaining proposals, remain protected by the duty of fair representation. As mentioned, that duty ensures that the unions may not negotiate a collective bargaining agreement that discriminates against nonmembers in the terms and conditions of employment. See Janus, 138 S. Ct. at 2468; Emporium Capwell Co., 420 U.S. at 64 ("by the very nature of the exclusive bargaining representative's status as representative of all unit employees, Congress implicitly imposed upon it a duty fairly and in good faith to represent the interests of minorities within the unit"). Here, the employees have not plausibly alleged that the unions committed a breach of the duty of fair representation for the reasons discussed supra. Thus, we conclude, it is not a breach of the duty of fair representation to prevent nonmembers from participating in the selection of bargaining committees or the development of bargaining proposals. The Supreme Court has deemed such exclusive representation to be constitutional.

4. Conclusion. For the foregoing reasons, we vacate as moot the board's decision with respect to the agency fee

provisions of G. L. c. 150E, § 12, and we affirm the board's decision with respect to the exclusive representation provisions of G. L. c. 150E, §§ 2, 4, 5, and 12.

<u>So ordered</u>.